In re VANIMAN INTERNATIONAL, INC., Debtor.

Joseph T. PIRRONE and James A. Martin, Plaintiffs,

v.

Leonard TOBOROFF, as Trustee of the Estate of Vaniman International, Inc., Debtor, Defendant.

Bankruptcy No. 180–03984–21.
Adv. No. 180–0731–21.

United States Bankruptcy Court, E. D. New York.

July 13, 1982.

**168**

Pinks & Feldman, Melville, N. Y., for plaintiffs; Bernard S. Feldman, Melville, N. Y., of counsel.

Chester B. Salomon, New York City, for Trustee of the Estate of Vaniman International, Inc.

OPINION

CECELIA H. GOETZ, Bankruptcy Judge:

In this proceeding, the plaintiffs, Joseph T. Pirrone and James A. Martin, are seeking recognition of the validity of a mortgage held on realty formerly belonging to the debtor, Vaniman International, Inc. ("Vaniman"), claimed by Vaniman's trustee in bankruptcy to be voidable as a fraudulent conveyance and as a preference. On similar grounds the trustee challenges the transfer to them of certain life insurance policies. In addition, the trustee seeks to recover $35,000 from the plaintiffs as disbursed by them in breach of their fiduciary duty to the debtor corporation when the plaintiffs were in control of that corporation.

When Vaniman filed its voluntary petition under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 *et seq.*, on July 11, 1980, a mortgage foreclosure proceeding brought by the plaintiffs in the Supreme Court of the State of New York, County of Suffolk, was automatically stayed under § 362(a) of the Code, 11 U.S.C. § 362(a). This proceeding was initiated by plaintiffs on September 9, 1980 to lift that stay so that they might proceed with their foreclosure proceeding. Alternatively, plaintiffs sought an order directing Vaniman to surrender possession of the real property, or an order under § 361, 11 U.S.C. § 361, for adequate protection in the event Vaniman was permitted to continue using this property.

On September 24, 1980, Vaniman served an answer and counterclaims which were adopted and expanded by Leonard Toboroff, trustee of the estate of Vaniman, subsequent to the conversion of Vaniman's bankruptcy proceeding to Chapter 7. 11 U.S.C. § 701 *et seq.* In essence, the counterclaims assert that the creation of the mortgage and the transfer to the plaintiffs of certain life insurance policies constitute a fraudulent conveyance which the trustee can avoid under §§ 544(a) and (b), and 548 of the Bankruptcy Code; that the transfers

of the life insurance policies were preferences which the trustee can avoid under § 547 of the Bankruptcy Code; and that certain payments of monies by Vaniman in 1976 to an employee of Ford Motor Company-Export Division constituted a breach of the plaintiffs' fiduciary duty to Vaniman, for which they are liable to the trustee under § 541(a)(1) of the Bankruptcy Code and New York Business Corporation Law § 720(b).

On February 24, 1981, the property covered by the plaintiffs' mortgage was sold through the bankruptcy court with liens to attach to the proceeds, mooting plaintiffs' complaint insofar as it seeks relief from stay and converting it to a claim to a right to a portion of the proceeds of such sale now in the possession of the trustee.

At the close of the trial, the trustee moved to conform the pleadings to the proof, a motion which the Court has granted.

## FINDINGS OF FACT

### A. *Description of Vaniman*

1. Vaniman is a New York corporation, organized in 1953, which specialized in the manufacture, installation, and repair of truck bodies and related equipment (PXs—1–3; 53, 459). Its business was located at 30 Central Avenue, Farmingdale, New York (61).[1]

2. Joseph T. Pirrone joined Vaniman in 1956 after eleven years of employment in the Export Division of General Motors Corporation (289, 961, 993–94). At Vaniman, he was in charge of sales (288). The area of specialization of the plaintiff, James A. Martin ("James Martin" or "Martin"), was finance (198).

3. From 1970 to September 4, 1979, Joseph T. Pirrone and Martin held a majority of the outstanding stock of Vaniman (57–58) and on September 4, 1979 owned all the corporation's stock (60, 346). From January 1, 1977 to September 4, 1979, Joseph T. Pirrone was President of Vaniman and Martin was its Executive Vice President

(58–59). From January, 1977 to September 4, 1979, the directors of Vaniman were Pirrone, Martin, and three other men, two of whom ceased being directors sometime prior to September 4, 1979 (59–60). Although Pirrone ceased to be President of Vaniman on September 4, 1979, he continued to be an officer of that company until sometime in 1980 (361).

4. Pirrone has known Martin since 1955, and they have been partners in Vaniman since the late 1950s (196). Between 1975 and September 4, 1979, Pirrone discussed with Martin major policy issues, advised him of large orders, and Martin, in some instances, assisted Pirrone in arriving at the prices that Vaniman quoted for jobs (197–98). Martin and Pirrone shared responsibility for the operations of Vaniman's business: Martin had an "equal say-so" with Pirrone (198). When a large piece of equipment would be required, Pirrone consulted with Martin before undertaking the commitment (198–99). On matters of importance, there was an understanding between them that there would be agreement before the corporation would undertake a particular course of action (199).

5. Although Martin, unlike Pirrone, was not present at the premises of Vaniman on a daily basis, going there only 30 or 40 times per year prior to the sale of his stock on September 4, 1979 (1230–31), Martin, up to that date, was equally responsible with Pirrone for the operation of the business of Vaniman.

### B. *1975–1978*

6. In 1975–76, Pirrone, as an officer of Vaniman, negotiated with the Ford Motor Company-Export Division for a contract to install truck bodies on a shipment of 680 vehicles intended for the Nigerian Army (214, 300–302). After Vaniman submitted a bid of $2,390 per vehicle (302), which would have yielded a profit of $378–$380 per vehicle (304), or about $260,000 in all (214, 304), the general manager of the Ford Division, Michael Colletti, requested Pirrone to meet

---

1. All numbers in parentheses not otherwise identified are to the transcript of the trial.

him in Fort Lauderdale, Florida (307–310). At that meeting, Colletti told Pirrone that Vaniman would not receive the order unless it paid Colletti a "commission" of $100 per truck (214–15, 313–15).

7. Present also at the meeting with Colletti and Pirrone was the President of Aacon Contracting Co. which Colletti suggested carry out the actual work required to complete the contract (312).

8. Pirrone objected to payment of the commission, but Colletti made it plain that otherwise Vaniman would lose the contract (314–15). On Pirrone's return from Florida, he advised Martin of Colletti's demand, and Martin, although he was not pleased, authorized the transaction (225–33).

9. Vaniman was awarded the Ford contract in November, 1975, eight weeks after the Florida meeting (316). It was the largest order in Vaniman's two-decade history, amounting to $1,625,000 (214, 318, 1204).

10. During the months of September, October, and December, 1976, Vaniman, at the direction of Colletti, paid $35,000 in four or five checks to CP&T Sales Co., a corporation designated by Colletti to receive the agreed-upon commission (216–17, 236–39, 320; Ex. L). Pirrone made the payments until he was told by Colletti to stop because a problem had developed (319–23).

11. Vaniman itself did no work on the contract. The work was performed by Aacon Contracting Co. Vaniman's role was evidently limited to checking daily on the progress of the work so that it could bill for it (316), as the following colloquy established: "THE COURT: * * * You did absolutely nothing more than collect the money? THE WITNESS [James Martin]: That was the delightful part of it." (1234).

12. As a result of the Ford contract, Vaniman realized a profit of $220,000 in 1976 (325, 382–83, 385). Its total net income for that year was $50,580.55 (383) on gross sales of $2,877,605.39, of which the Ford order represented more than 50 percent (381–82).

13. There is no evidence that Martin or Pirrone received any benefit from the payments made by Vaniman to CP&T Sales Co., nor that either derived any personal benefit directly or indirectly from the Ford contract, except in their capacity as stockholders of the Vaniman corporation. But for the money collected from Ford in connection with Colletti's misconduct, Vaniman would have operated at a loss, indicating that its regular operations were no longer profitable.

14. 1976, the year of the Ford order, was the last year on which Vaniman showed a profit. Neither that year, nor in any subsequent year, was any money spent by Vaniman for new equipment (DXs–A, C, D, L).

### C. 1977–78

15. The American automobile industry began declining some time in the 1970s along with the economy, and Vaniman's sales reflected the difficult time the industry was experiencing (63–64).

16. During 1977, Vaniman lost $92,000 on sales of nearly $1.4-million (Schedule 3 to DX–A). At the close of that year, its current liabilities exceeded its current assets by over $100,000 (DX–A, at schedules 1, 2).

17. In 1978, Pirrone requested a real estate expert to place a value on Vaniman's realty and received a letter dated March 1, 1978 from William E. Greiner of the firm of Greiner Maltz Co., Inc., a real estate broker, which appraised the property in which Vaniman carried on its business—the building and the plot on which it was located—as having a current market value "for a truck repair operation" of $380,000 (DX–A). John T. Brady included this letter in Vaniman's financial statement for 1977 which showed $380,000 as the market value of the Vaniman realty (DX–A, at Schedule 1).

18. On May 16, 1978, when Vaniman applied to the Farmingdale branch of the Hempstead Bank for credit, that bank, after examining Vaniman's financial statements, refused to lend it money without collateral. In order to get the loan, Pirrone provided the bank with collateral from his own personal assets (66, 1037, 1043–46).

19. On May 9, 1978, Pirrone appeared before a Grand Jury which was investigating Colletti and flatly denied that Colletti ever directly or indirectly solicited or requested money from him or his companies in connection with any of their work for Ford (DX–S; *see also* 324–25). Later he admitted his perjury (DX–R, at 15–16), and on April 2, 1979, executed an agreement with the United States Attorney committing him to cooperate with the ongoing investigation of Colletti (DX–R, at 3–4).

20. Pirrone's efforts in 1978 to sell Vaniman or its stock were all unsuccessful (421). But Pirrone did receive an offer in November, 1978 for Vaniman's real estate. That month, Rick Kreindler of Rick Kreindler Associates, Inc., a real estate firm, wrote Pirrone that he was authorized by Bucknell Press, Vaniman's neighbor, to offer $375,-000 for that property, an offer that Pirrone turned down (PX–4; 446–47). Earlier, Pirrone had told Kreindler that for the property alone, Vaniman wanted "$425,000 on the net side" (447).[2]

21. During 1978, Vaniman's sales continued their decline. Its gross sales that year dropped to $1,143,975.19, and its operating losses doubled to $195,812.76 (DX–C, at schedule 3).

22. By the end of 1978, Vaniman was even deeper in debt than at the close of the previous year. As of December 31, 1978, its current assets were $201,479.71, against current liabilities of $522,651.10 (DX–C, at schedules 1, 2).

23. The difference between a company's current assets and current liabilities constitutes its working capital. A deficit in working capital signifies that a company is unable to pay its bills as they become due (744–45). In Vaniman's case, its deficit in working capital had grown in the space of one year from $106,813.93 in 1977 (DX–A, at schedules 1, 2) to $321,171.39 in 1978 (DX–C, at schedules 1, 2).

24. The balance sheets in Vaniman's financial statements for both 1977 and 1978 show figures labeled "Book Value" and figures labeled "Market Value" (DX–A, at schedules 1, 2; DX–C, at schedules 1, 2). The principal differences between "Book Value" and "Market Value" are due to the higher market values attributed to Vaniman's real estate and fixed assets as compared with their book values. In each case, the market value of the real estate is stated to be $380,000; in 1977, the market value of Vaniman's fixed assets was put at $66,000, in 1978 at $70,000. Based on Book Value, Vaniman's liabilities at the end of 1978 exceeded its assets by $179,485.26; based on the claimed Market Value, assets exceeded liabilities by $52,744.34 (DX–C, at schedules 1, 2).

### D. *1979*

25. In 1979, Vaniman's sales continued their decline. During the first eight months of that year, its total sales fell to $362,416.68 which projected on a 12-month basis would be around $550,000. This represented about one-third of its sales in 1977, and less than one-half its sales in 1978, both years in which it had lost money. Its financial statement for the period shows a net loss of $10,813.94 (DX–D, at schedule 3).[3]

26. With Vaniman's sales at their lowest level in its history, and with a two-year-old deficit in working capital, Vaniman was unable to meet its bills as they fell due. By mid-1979, some creditors had not been paid for over a year (64–65); Peabody Galion was owed in excess of $108,000 (65, 554–55, 1117; *cf.* DX–M); other creditors, including Dover Corporation, were suing for payment (498, 510–11 (Dover); 500 (Ford)).

27. To meet its most pressing obligations, Vaniman had to borrow funds. It increased its borrowing from the Hemp-

---

2. On July 16, 1979, Kreindler wrote Pirrone requesting preparation of a contract to sell the property to the same principals for "$460,000, subject to Job Development Authority financing" (PX–5).

3. This loss would have been closer to $30,000, except for the inclusion in Vaniman's income of rental payments and $15,000 given Vaniman in connection with the sale by James Martin and Pirrone of their Vaniman stock to Jack Martin (DX–D, at schedule 3).

stead Bank, so that as of April 3, 1979, it owed that Bank $46,500, secured by Pirrone's collateral (1046–47). It also borrowed from its officers and employees. Martin lent Vaniman $10,000 in January or February, 1979 to pay its real estate taxes (354); Pirrone lent it $23,857.63 to meet its payroll and operating expenses (353–54); Robert Kral, its service manager, lent it $10,000 in May or June, 1979 to meet its payroll (351–52).

28. In March or April, 1979, one Joseph L. Cote, advised of the possible availability of the Vaniman building by Greiner Maltz Real Estate, began negotiating with Pirrone and Martin to buy the stock of Vaniman (157–169, 259–70, 932–35, 939–40). At the time Cote was associated with Great Escape Motor Homes, Ltd. ("Great Escape"), of which Jack Martin was then general manager (572, 598–99). Jack Martin served as Cote's intermediary and Pirrone gave him Vaniman's financial statements for 1977 and 1978 to transmit to Cote (166–69, 462–67, 478–79, 613–14, 934). Sometime in late June, or early July, the deal with Cote collapsed (169, 270, 476–77), and around the same time, Jack Martin ceased to be an employee of Great Escape, which itself went out of business in early July (472–73, 623). It was then that Pirrone and Jack Martin began discussing having Martin buy the Vaniman stock (169–70, 271–72, 477) and Martin was given Vaniman's financial statements for his own use (123, 479–80, 642).

29. In the summer of 1979, Jack Martin was twenty-eight years old (457). His education had stopped with high school (458). Neither he, nor his wife, had any money (458–59). Virtually all his employment had been as a salesman, except for a brief two-year period when he had operated as a franchisee for Snap-On Tools, a business venture which had ended in his personal bankruptcy, owing $40,000 (576–80, 590–93). He had no experience or knowledge respecting the type of business in which Vaniman was engaged and had no financial background (459).

30. Of all these facts he advised Pirrone. He had ample opportunity to do so since, starting June 1, 1979, when Great Escape leased the back half of the Vaniman premises, he was present at Vaniman on a daily basis (469–70). While there, he engaged in frequent conversations with Pirrone telling Pirrone everything he had done from high school on, including the details of his personal bankruptcy (471–72, 493, 643–44). When Pirrone requested a personal financial statement, he told Pirrone that it would serve no purpose since he had no assets and no money (274, 369, 492–93). Asked about his "credibility * * * [c]redit-wise," he told Pirrone that he "couldn't obtain a loan because [he] had a bankruptcy a couple of years prior" (493).

31. During the course of the negotiations, Pirrone told Jack Martin that the inventory on hand had a value of $125,000 (551); that the equipment was worth between $50,000 and $75,000 (Id.); that the accounts receivable would bring about $48,000 (Id.); and that the work in progress would lead to a profit of approximately $60,000 (554). He also stated the real estate was worth $420,000 (551). Jack Martin accepted these figures; no inventory was ever taken (694). Pirrone also told Martin that Vaniman's largest creditors would settle for half of what was owed them (550, 553–56).

32. At a meeting attended by James Martin, Pirrone, and Jack Martin sometime prior to August 2, 1979, Jack Martin was told that he would have to give security and James Martin suggested a second mortgage on the Vaniman property (273, 836). According to Jack Martin, Pirrone and James Martin wanted "[a] guarantee that they would be paid somehow and the only asset that Vaniman had then was the land and building, which had low money owing on it. In order to go ahead with the deal, they said I would have to have the [Vaniman] stocks held in escrow and take out a second mortgage on Vaniman" (836).

33. On August 1 or 2, 1979, Jack Martin, Pirrone, and James Martin signed a document entitled "Proposed Contract On the Sale of the Capital Stock of Vaniman Inter-

national, Inc." ("Proposed Contract") (DX–M). The contract provided that on its signature, Jack Martin was to pay Vaniman $15,000, which would go to pay Robert Kral $10,000 and Pirrone $5,000 on the debts owed them by Vaniman (DX–M, ¶ 1); that within thirty days thereafter, Jack Martin would purchase the outstanding stock of Vaniman for $125,000, payment to take the form of a seven-year note with interest at 13 percent (DX–M, ¶ 2(a)); that he would pay in full the $46,500 due the Hempstead Bank (DX–M, ¶ 2(b)); and that he would pay James Martin and Pirrone $33,857.63 owed them by Vaniman notes payable over five years with interest at 13 percent (DX–M, ¶ 2(c)). The contract further provided that Jack Martin agreed that the deferred payments for the stock and on Vaniman's debts to James Martin and Pirrone would be "guaranteed by a second mortgage on the land and buildings of Vaniman" (DX–M, ¶ 3).

34. When Jack Martin signed the Proposed Contract, he advised Pirrone that he would be unable to pay off the Hempstead Bank at the closing, as the contract provided (650–51, 843), but that it would be paid out of profits from the orders on hand (651).

35. At the signing of the Proposed Contract, Jack Martin gave Pirrone a check for $15,000 made out to Vaniman payable by Adventure Motor Homes Rentals (172–73, 372, 674), a trade name which Jack Martin had apparently started to use after Great Escape Motor Homes ceased to function (574–75). Of this money, $10,000 went to repay Robert Kral the money owed him, and the rest was used to meet Vaniman's current obligations to enable it to continue operating (278–79, 422).

36. On August 2, 1979, when Jack Martin signed the Proposed Contract, he also was shown a proposed four-year employment agreement between himself and Joseph Pirrone (653) which called for Pirrone to be employed as a consultant by Vaniman following the sale of the capital stock for a period ending December, 1983 at a salary of $24,000 and required Pirrone to be present at Vaniman on a daily basis (DX–G). Al-though Jack Martin agreed to these terms (499), he did not execute this agreement when he first saw it, signing it only in May or June, 1980 (499–500, 529–30, 653–54), but he paid Pirrone when cash was available the salary called for by the agreement (DX–O; 503–04, 811–12, 814).

### E. The September 4, 1979 Documents

37. On September 4, 1979, the first business day following the close of business on August 31, 1979, a group of documents prepared by Vaniman's attorneys, Dean, Falanga, Sinrod & Rose, Esqs., were executed: "Purchase Agreement" (PX–1; DX–E), a mortgage (PX–2), a bond (PX–3), and a supplementary agreement (DX–F). All four documents were signed on behalf of Vaniman by Jack Martin, as president. The "Purchase Agreement" and the agreement supplementing it were signed also by James Martin, Jack Martin, and Pirrone, each in their individual capacity.

38. The Purchase Agreement is a complex document embracing a variety of "mutual representations, warranties and promises" (PX–1, at 1) among James Martin and Pirrone, referred to as the "Sellers," Vaniman, referred to as the "Guarantor" or the "Corporation," and Jack Martin, referred to as the "Purchaser" (*Id.*):

(1) *The Sale of Stock.* The agreement calls for the sale to the Purchaser of all shares of stock of Vaniman, but requires 51 percent to be held in escrow by the Sellers' attorneys as security for payment of their purchase price (¶ 2.3). The purchase price for the shares of the stock is stated to be $125,000 (¶ 2.1), payable in 84 equal monthly installments beginning October 1, 1979, with interest at 13 percent (¶ 2.2(a)).

(2) *Life Insurance Policies.* The "Purchase Agreement" provides that the Corporation is to transfer ownership to James Martin of an insurance policy it holds on his life in the principal amount of $52,500 (¶ 2.1.1(a)), to transfer to Joseph T. Pirrone a policy on his life in the amount of $25,000 (¶ 2.1.1(b)), and to surrender three other policies on the life of

Pirrone and apply their cash values against outstanding loans on the two transferred policies (¶¶ 2.1.1(c) and (d)).

(3) *Vaniman's Debts.* Both Jack Martin and Vaniman acknowledge that Vaniman owes Pirrone $23,857.63, James Martin $10,000, and the Hempstead Bank $46,500 plus interest (¶ 2.2.1). Under the agreement, Vaniman undertakes to pay Pirrone and Martin the amount owed in sixty monthly installments beginning October 1, 1979 with interest of 13 percent (¶¶ 2.2.3, 2.2.4). These payments are expressly excluded from the purchase price of the stock and are described as "a return of loans" (¶ 2.2.6). With respect to the debt owed the Hempstead Bank, the Purchase Agreement commits Jack Martin to loan Vaniman a sufficient sum at the closing to pay the Bank $46,500 plus interest (¶ 2.2.2(b)). Jack Martin also undertakes to lend the corporation $15,000, prior to closing, to repay Vaniman's indebtedness to Kral and part of its indebtedness to Pirrone (¶ 2.2.2(a)).

(4) *Default.* In the event of default by either Vaniman or Jack Martin in any of the deferred payments, all the notes are to become immediately due and payable at the option of the sellers (¶¶ 2.2(d), 2.2.-3, 2.2.4).

(5) *The Second Mortgage.* As security for all the payments called for by the Purchase Agreement, Jack Martin agrees to cause Vaniman "to execute and deliver to Sellers at the time of Closing, a second mortgage and mortgage Note in the principal sum of $158,857.00" in favor of Pirrone and Jack Martin (¶ 2.3.1). In the event of a default in the payment of any of the notes, the Sellers are given the right to declare the full amount due on the Second Mortgage and Mortgage Note payable immediately (¶ 2.3.2).

39. Jack Martin, on September 4, 1979, as President of Vaniman, executed a bond and mortgage, both in the amount of $158,-857, mortgaging the building and real estate in which Vaniman did business, as called for by the Purchase Agreement (PXs–2 and 3).

40. Because Jack Martin did not have $46,500 on September 4, 1979 to lend Vaniman to pay the Hempstead Bank, a supplement to the Purchase Agreement bearing the same date was signed, under which Pirrone agreed to remain as guarantor on the note due the Bank for a period not to exceed six months, within which time Jack Martin agreed to comply with the Purchase Agreement by lending Vaniman sufficient money to repay the obligation (DX–F).

41. In accordance with the Purchase Agreement, Vaniman (a) surrendered certain life insurance policies owned by the debtor on the lives of Pirrone and Martin and caused payment of the cash surrender value to Pirrone, and (b) transferred to Pirrone and Martin certain other life insurance policies owned by the debtor on the lives of Pirrone and Martin (*compare* DX–C, at schedule 8 *with* DX–D). The cash surrender value of the policies surrendered (DXs–K, O) were:

| | Cash Surrender Value |
|---|---|
| (1) New York Life No. 33853980 Paragraph 2.1.1(c) of Purchase Agreement | $ 8,418.96 |
| (2) New York Life No. 32289326 Paragraph 2.1.1(d) of Purchase Agreement | 1,665.62 |
| (3) New York Life No. 33099335 Paragraph 2.1.1(d) of Purchase Agreement | 568.21 |
| Subtotal | $10,652.79 |

The cash surrender value of the policies transferred based on their value at the end of 1978 (PX–C, at schedule 8) were:

| | Cash Surrender Value |
|---|---|
| (4) New York Life No. 27700543 (Pirrone) Paragraph 2.1.1(b) of Purchase Agreement 12/31/78 surrender value | $ 526.08 |
| (5) Travellers No. 99045NW202 (Martin) Paragraph 2.1.1(a) of Purchase Agreement 12/13/78 surrender value | 1,857.33 |
| Subtotal | $ 2,383.41 |

42. Respecting the sale of the stock to Jack Martin, James Martin testified: "I sold my stock of Vaniman to Mr. John Martin. By so doing, it was my hope and intention that Vaniman would continue as an operating company. Mr. Pirrone and myself are getting along in years. The company needed new blood. It needed *additional monies* which Mr. Martin claimed

that he was going to get for the company, either through himself or through others. It gave the company an outlook for the future and, again, young blood into the corporation" (Emphasis supplied) (883).

43. Neither Pirrone, nor Martin, believed that Jack Martin would be able to pay from his own resources the $125,000 to which he committed himself (187, 340–41). They knew that he expected to pay for the stock by borrowing money and by completing the orders which Vaniman had on hand (Id.), and that in order to do so, monies would have to be borrowed for labor and materials.

44. Apart from the $15,000 "loan" in August, 1979, Vaniman received no consideration for guaranteeing the payment by Jack Martin to James Martin and Pirrone for the purchase price of their stock, nor for so much of the bond and mortgage dated September 4, 1978 as constituted a security for such guarantee (194, 883). So much of the bond and second mortgage executed September 4, 1979 as exceeded $125,000 was supported only by the alleged antecedent indebtedness to James Martin and Pirrone.

45. Vaniman received nothing for the transfer of its interests in the life insurance policies it held on the lives of Pirrone and James Martin. The transfer of the insurance policies benefited only Pirrone and James Martin, not the debtor.

### F. Vaniman's Financial Condition on September 4, 1979

46. On September 4, 1979, Vaniman's current liabilities exceeded its current assets by $223,990.78. Its current liabilities were $322,738.84, its current assets, $98,-748.06 (DX–D, at schedules 1, 2). This meant that it had no working capital.

### (1) Real Estate

47. The fair market value of Vaniman's real estate on September 4, 1979 was not more than $380,000. This was the figure at which the real estate had been appraised on March 1, 1978 by an expert for specialized use as a "truck repair operation" (DX–A) and was the figure adopted in Vaniman's financial statements for both 1977 and 1978 as the realty's market value (DXs–A and C, at schedule 1). In the year or more during which Vaniman's real estate had been on the market prior to September 4, 1979, the highest firm offer received for it was $375,-000.

### (2) Equipment

48. On September 4, 1979, Vaniman's equipment, including its factory and machinery, tools, office furniture, and automobiles had a maximum market value of $66,-000 and was probably worth only a fraction of that figure. In Vaniman's 1977 financial statement, the figure of $66,000 is stated to be the "Total value of fixed assets, excluding real estate, according to appraisal made by Joseph T. Pirrone, President of the Company." (DX–A, at schedule 1, p. 3.)

49. Vaniman's general ledger (DX–L), as well as its financial statements (DXs–A, C, D) disclose that no money was spent for equipment of any character subsequent to 1977. Indeed, nothing was purchased after 1975. Thus, the equipment on hand on September 4, 1979 was the same equipment to which Pirrone and Vaniman had earlier assigned a maximum value of $66,000 (compare DX–A, schedules 6–1, 6–2, and 6–3 with DX–D, schedules 6–1, 6–2, and 6–3).[4]

---

4. Pirrone and Martin called as a witness a former Vaniman customer, Peter Masiakou, to establish that Vaniman's financial statements, in particular, Schedule 6–1 to Exhibit D, did not fully reflect all the equipment on hand on September 4, 1979, and that the fair market value for Vaniman's equipment as of that date was around $95,000 or $96,000 (1101). What Masiakou did was to examine schedule 6–1 to DX–D, then add to the figure shown there as the cost of Vaniman's equipment whatever he could recall as being on the premises and not specifically described in that exhibit (1085–1105; Court Ex. One). Even so, the highest figure he was able to support was $71,291 (Court Ex. One). Moreover, the internal evidence provided by the various financial statements negates Masiakou's assumption that the financial statements did not fully reflect the value of miscellaneous tools or of the De Vilbis spray booth (compare DX–C, schedule 6–1 (which is identical, except for the differences in

50. While $66,000 is the maximum fair market value Vaniman's financial statements permit Martin and Pirrone to claim its equipment to have had as of September 4, 1979, this figure is indubitably higher than the true figure. All Vaniman's equipment at that time, including its three automobiles, was far from new. The supporting schedules which show the dates on which the individual items were bought show that all Vaniman's machinery and equipment, except one shop crane purchased in 1974, had been acquired no later than 1970 (DXs–A, C, D, at schedule 6–1); its three automobiles dated back to 1972, 1973, and 1975, respectively (DXs–A, C, D, at schedule 6–2); and all of its furniture and fixtures had been purchased no later than 1975, most of it much earlier (DXs–A, C, D, at schedule 6–3). According to Vaniman's records, the total cost of all the equipment on hand on September 4, 1979, including its three automobiles, was $73,434.57 (DX–D, at schedule 6). This is the same equipment to which Exhibit A assigns a fair market value of $66,000 (DX–A, at schedule 1). That after many years of use, the market value of used office machinery, shop equipment, and three automobiles had stayed so close to original cost appears most dubious. Indeed, if the three automobiles are subtracted, the fair market value assigned the balance of Vaniman's fixed assets exceeds their original cost.

51. It is not irrelevant that the sale on March 17, 1981 under the auspices of the bankruptcy court of all Vaniman's machinery and inventory brought in only $59,-603.25 (DX–V), despite the fact that it included an item of equipment purchased subsequent to September 4, 1979 for $10,400 (1254–55, 1265–66).

52. However, certainly no higher market value can be claimed for Vaniman's equipment as of September 4, 1979 than Pirrone's own appraisal in 1977 of $66,000.

### (3) Inventory

53. The inventory on hand on September 4, 1979 had a maximum fair market value of $58,000. This is the value assigned to it in Vaniman's financial schedule for the eight months terminating August 31, 1979 (DX–D, at schedule 1).

54. That Pirrone disclaims knowledge of the source of this figure is without significance because of the evaluation the Court has made of Pirrone's credibility. The evidence establishes that the source of the inventory figures in each of the preceding financial statements was Pirrone (297–98, 965–66, 968; page 2 of Brady letter in DXs–A, C) who testified that an inventory was taken at Vaniman on a regular monthly basis (297). It is a fair inference, therefore, despite Pirrone's disclaimer that he was, likewise, the source of the $58,000 figure. But whether he is or not, the Court deems this figure the most liberal valuation of inventory that the record will support.

55. The Court attaches no weight whatever to PX–6, which Pirrone completed the day before its introduction, purporting to show the inventory on hand and its value as of September 4, 1979 (1124). The circumstances of the preparation of this exhibit, the deliberate failure to bring to court the underlying documentation, and the evasiveness of Pirrone's answers when pressed as to what inventory figures he had available at the time of the exhibit's preparation, all deprive it of any probative value (957–1034, 1114–35).

56. Likewise, the Court deems of no probative value that Pirrone told Jack Martin that the inventory had a value of $125,000 (551, 694) and that Jack Martin did not question this value (693–94), even though he subsequently found the inventory to be virtually unsalable (842, 856).

57. According to Jack Martin, he was unable to use the inventory to raise funds for the operation of Vaniman because "[y]ou can't sell it. Nobody wants it" (842).

depreciation, with DX–D, schedule 6–1) *with* DX–A, schedule 1, p. 3). By adding figures derived from two sources, Vaniman's financial statements and his own recollection, Masiakou

necessarily duplicated values. For other reasons as well, his testimony lacks probative value.

The inventory was illiquid because there was little demand for stock as old as that which Vaniman had on hand. Martin testified that he told Pirrone when Pirrone pressed for payment that "we just didn't have any inventory to sell. * * * We had nothing there. We had the rack bodies but most of it wasn't salable." (841–42.) The rack bodies were not salable because the stock was old, some 10-, 15-, to 20-years-old (842).

58. Inventory which no one wants, whatever its cost, has only scrap value. Accordingly, crediting that inventory with a fair market value of $58,000 appears more than liberal.

### (4) Accounts Receivable

59. The maximum value of Vaniman's accounts receivable as of September 4, 1979 was $32,305.86. This is the figure shown on DX–D, schedule 1. Like all the figures in DX–D, it probably overstates Vaniman's assets in that it deems only $10,000 of the total claimed, $42,305.86, to be uncollectible. In fact, only about $20,000 proved to be collectible (846–47), suggesting that DX–D overstated the value of accounts receivable by $10,000.

### (5) Other Assets

60. In addition to the assets considered in the foregoing paragraph, Vaniman's financial statement for the eight months ending August 31, 1979 shows additional assets consisting of cash in the bank ($8,442.20) and credits for prepaid mortgage and insurance, totaling $4,801.48 (DX–D, at schedule 1).[5]

### (6) Solvency

61. Based on the maximum fair market value earlier found, Vaniman's assets on September 4, 1979 totaled, at most, $549,-550, composed of the following: real estate ($380,000), fixed assets, other than real estate ($66,000), inventory ($58,000), and accounts receivable ($32,306), cash ($8,442.20), and other assets ($4,801.48).

62. Vaniman's liabilities as of September 4, 1979, as reflected in its financial statement for the eight months ending August 31, 1979, were $533,259.51 (DX–D, at schedule 2). Accordingly, Vaniman's assets viewed most liberally slightly exceeded its liabilities. The surplus is $16,290.49. For the reasons given, however, it seems most unlikely that the fair market value of Vaniman's assets actually totaled $549,550 on September 4, 1979.[6]

63. When Vaniman increased its liabilities by $125,000 by placing a second mortgage on its real estate in the amount of $158,857, it converted the small surplus existing as of September 4, 1979 into a deficit in the neighborhood of $100,000. Increasing Vaniman's liabilities by $125,000 as the result of the guarantee, bond, and mortgage executed on September 4, 1979 rendered it insolvent. Its liabilities rose as a result to a total of $658,259.51, while its assets were only $549,550.

### G. Post-1979

64. Subsequent to September 4, 1979, Pirrone continued to occupy the same office on Vaniman's premises as he had done previously, remaining there until August or September, 1980 (348). He continued to receive mail and telephone calls at Vaniman (348–49); he assumed the office of Vice-President of Vaniman (190, 361); and he remained a signatory on the account with the Hempstead Bank until mid-1980 (361).

65. To permit Vaniman to continue operating and to pay wages, Pirrone borrowed

---

5. The life insurance values on the lives of Vaniman's officers which had entered into the figures reflecting assets and liabilities in Vaniman's previous financial statements are lacking from the statement prepared for the period terminating on August 31, 1979, probably because of the transfer of these policies to James Martin and Pirrone pursuant to the Purchase Agreement of September 4, 1979.

6. Among other reasons for viewing Vaniman's 1979 balance sheet as overstating assets is that the balance sheet credits Vaniman with cash of $8,442.20, although this was simply a temporary circumstance (505).

$25,000, which has never been repayed (719), from Kral and other Vaniman employees (506–08, 712–18). After Jack Martin became the owner of Vaniman's stock, he increased its payroll and built an additional office which may have increased Vaniman's financial difficulties (330, 702–03).

66. On October 3, 1979, Pirrone, represented by Anthony Falanga, Esq., appeared before Judge Whitman Knapp to plead guilty to giving false testimony to a Grand Jury and violating 18 U.S.C. § 1623. Pirrone's counsel told the Court that the Ford transaction has been entered into "to protect the business [Pirrone] had had for so many years that was in financial difficulty." (DX–R, at 14.) On October 28, 1980, Pirrone received a suspended sentence and was put on probation for five years for violating 18 U.S.C. § 1623 (DX–T).

67. To find money with which to pay James Martin and Pirrone, Jack Martin endeavored to interest various potential investors (708–12). The group with which Margaret Janaskie was associated ultimately gave Jack Martin approximately $66,000 between November, 1979 and April, 1980, all of which went into the corporate checking account (709–12, 723). Out of the monies which Jack Martin received in December, 1979, he paid the notes due Pirrone and Martin for October, November, and December (709), and also paid Pirrone some amounts on account of salary. Pirrone received a total of $8,271.77 in December, 1979 and January, 1980 on his notes (DX–O), and $3,150 on account of salary (DX–O).

68. In connection with Jack Martin's efforts to raise money by selling his stock or borrowing funds, James Martin and Pirrone, on December 27, 1979, signed an amendment to the September 4, 1979 Purchase Agreement authorizing release of the Vaniman stock from escrow (DX–I; 726–27,

817–19). In March, 1980, Pirrone authorized John F. Brady to make Vaniman's 1979 financial statement available to Jack Martin to show potential investors (533–46).

69. On May 12, 1980, Margaret Janaskie, who had acquired a majority of the outstanding shares of Vaniman's stock, ordered Jack Martin off the premises (242, 528). In light of this development, James Martin and Pirrone were able to persuade Jack Martin to sign both the employment agreement dated August 2, 1979 (DX–G), and a second one dated February 1, 1980 (DX–H), between Vaniman and Pirrone (529–30). The February 1 agreement was similar to the earlier agreement, except Pirrone's salary was increased to $36,000 from $24,000, and the agreement itself was conditional on the carrying out of the September 4, 1979 agreement.[7] Although Jack Martin still held the title of president, his authority to sign the agreement is questionable (532).

70. During the period Jack Martin operated Vaniman, he deducted withholding taxes from the wages paid his employees, but failed to pay over these taxes to the appropriate authorities (509, 815–16).

71. Although Pirrone had talked of immediate foreclosure proceedings when Jack Martin first fell behind on his payments on October 1, 1979 (841), and an attorney was engaged by James Martin and Pirrone in March or April, 1980 for that purpose (365), no action was taken until the Hempstead Bank satisfied the $46,500 debt owed it by Vaniman by setting that figure off against monies which became due Vaniman around June 24, 1980 under a bank letter of credit. The Hempstead Bank had started pressing hard for payment after a judgment creditor just before Christmas attached Vaniman's bank account at that bank (359, 511–12, 516; PXs–7–10). Pirrone had pointed out to the bank that funds would become avail-

---

**7.** Jack Martin testified that when he signed the agreement in Pirrone's office in the presence of Pirrone and James Martin, "Mrs. Janaskie and her people, Castellano and Pepe, were really turning the place upside down, and we had to do something, we, the three of us, had to do something to protect our interests down there. I was frustrated. I didn't know what to do. I told [Pirrone] I didn't know what to do. [Pirrone and James Martin] had suggested the only thing they can do is basically I am out and at any time they can stop me from coming on to the premises, but if I sign the employment contracts, that would allow Mr. Pirrone to stay in the office and keep an eye on the company and watch out for our interests" (530).

able to Vaniman under a letter of credit when it completed an outstanding contract (357, 362, 364), and when this occurred, the bank offset the debt against the monies owed Vaniman, draining it of operating capital (1055–58; DX–U).

72. In or about June, 1980, James Martin and Pirrone brought a proceeding in the state court to foreclose their second mortgage on Vaniman's realty (Plaintiffs' Proposed Findings of Fact, ¶ 11).

73. Within a month, on July 11, 1980, the debtor filed a petition under Chapter 11 of Title 11 of the United States Code. In September, 1980, Pirrone and Martin initiated the instant proceeding seeking relief from stay so that they could pursue their foreclosure proceeding in the state court. Relief from the automatic stay imposed by 11 U.S.C. § 362 was also sought by the holder of the first mortgage of Vaniman's real estate, Roslyn Savings Bank. At a hearing on Roslyn's application on October 15, 1980, Roslyn called an expert witness, J. Robin Newbold, who testified that the value of the Vaniman real estate was approximately $360,000.[7a] Counsel for Martin and Pirrone requested that this testimony be deemed applicable in their proceeding against the debtor.[7b]

74. On October 31, 1980, by consent, the debtor's Chapter 11 reorganization was converted to a Chapter 7 liquidation and on November 21, 1980, Leonard Toboroff, the defendant herein, was duly elected permanent trustee and has qualified, and is presently acting in that capacity.

75. Toboroff sought and received authority to sell the Vaniman realty with all liens to attach to the proceeds. On February 24, 1981, the real property owned by Vaniman was sold through the bankruptcy court for $535,000 (1288–90). The successful bidders were persons associated with Bucknell Press, Inc., which had previously sought to buy the land and building.

H. *Miscellaneous Findings*

76. Pirrone was not a credible witness; his answers were not characterized by candor; without adequate explanation he repudiated his answers on his deposition, which he had earlier gone over and corrected; he was evasive; and many of his answers were incomplete and misleading.

77. Likewise, James Martin appeared to be less than candid, giving evasive—and what the Court has concluded must be deemed untruthful—answers where his self-interest was involved.

I. *Vaniman's Financial Statements*

78. For a period of at least ten years ending with his death sometime after May, 1980, John F. Brady, a certified public accountant, prepared annual financial statements for Vaniman (69, 85–97, 377–78, 494–95, 863–72; DXs–A, C). At the request of Pirrone (100–03), he prepared a financial statement for the eight months ending August 31, 1979 (DX–D).

79. The annual financial statements indicate that the figures for merchandise inventory and work in progress, and for accounts receivable, were supplied by Pirrone and Vaniman employees (85, 297–98, 788, 794–97, 965–68, 1121; page 2 of Brady letters in DXs–A and C). All of the figures in the 1978 financial statement (DX–C) can be tied in and traced back to Vaniman's general ledger (792; DX–L0, and all the figures in the financial statement for the eight months ending August 31, 1979 (DX–D) can also be so tied in and traced, except the entries in the financial statement relating to the officers' loan accounts, including the transfer of certain life insurance policies (schedule 2–1B), the value of the inventory on hand as of August 31, 1979 (schedule 3–1), and certain other minor entries (784–87, 793–94).

7a. *Roslyn Savings Bank v. Vaniman International, Inc.* (*Vaniman International, Inc.*), Bankr.No. 180–03984–21; Adversary No. 180–0772–21 (B.C.E.D.N.Y.), Hearing, Oct. 15, 1980, Tr. at 50–58.

7b. *Id.* at 135–36.

80. It can fairly be inferred that the figure for inventory in the financial statement for the eight months ending August 31, 1979 was supplied by Pirrone in accordance with previous practice (796–97).

81. Although Brady spent relatively little time in later years at Vaniman's premises, the statements he prepared were of reasonably good quality from an accounting standpoint (787–88).

82. It was part of Vaniman's contract with Brady that he provide annual financial statements and they were received by Vaniman in the regular course of its business (864–69).

83. Vaniman supplied the financial statements prepared by Brady to banks (75–83; DX–N) and potential investors (420–21), in addition to Cote (Finding 28, supra), Jack Martin (123, 479–80, 642; ¶ 3.3.1 of PX–1), and Omega Air Carriers (536–44).

84. Prior to the trial herein, John F. Brady died (69).

*J. Bribery*

85. There is no evidence that any creditor at the time the petition herein was filed was owed a debt contracted by Vaniman in 1976 or earlier.

## DISCUSSION

### I.

### THE FRAUDULENT CONVEYANCE CLAIMS

In *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979 (2d Cir. 1981), Circuit Judge Kearse, writing for a unanimous court, described as follows the soil from which fraudulent conveyances grow:

"When an overburdened debtor perceives that he will soon become insolvent, he will often engage in a flurry of transactions in which he transfers his remaining property, either outright or as security, in exchange for consideration that is significantly less valuable than what he has transferred. Although such uneconomical transactions are sometimes merely final acts of recklessness, the calculating debtor may employ them as a means of preferring certain creditors or of placing his assets in friendly hands where he can reach them but his creditors cannot. Whatever the motivation, the fraudulent conveyance provisions of § 67(d) of the Bankruptcy Act, 11 U.S.C. § 107(d), recognize that such transactions may operate as a constructive fraud upon the debtor's innocent creditors, for they deplete the debtor's estate of valuable assets without bringing in property of similar value from which creditors' claims might be satisfied." 661 F.2d at 988–89.

Although § 67d of the Bankruptcy Act has been replaced by § 548 of the Bankruptcy Code, 11 U.S.C. § 548, Judge Kearse's observations have not lost their pertinence. Where insolvency is imminent, or has already been reached, what men seek to do is to remove their assets from the reach of their creditors and preserve them for their own enjoyment. This is precisely what occurred here.

Had Vaniman sold its real estate and liquidated its assets in the summer of 1979, it is probable that not enough would have been realized to pay its creditors, leaving its stockholders with nothing. It was in this context that Pirrone and James Martin, the two men in control of Vaniman, arranged to give themselves a preferred claim to Vaniman's equity in its real property and to acquire for their own benefit the life insurance policies held by Vaniman on their lives.

All this was engineered through the medium of a sale of all the outstanding stock of Vaniman to Jack Martin, a penniless young man with nothing to lose. Had Martin and Pirrone, on September 4, 1979, gratuitously placed a second mortgage on the Vaniman property in their own favor, the lien would not have been good as against the creditors of Vaniman. Martin's and Pirrone's ownership of Vaniman would have given them no more right to put a mortgage on Vaniman's property for their own benefit when that company was in financial difficulties, giving Vaniman noth-

ing in exchange, than to take money out of Vaniman's till and put it in their own pockets. Martin was simply a vehicle through which Martin and Pirrone did indirectly what they could not do directly.

What occurred here represents exactly the type of conduct which the law against fraudulent conveyances is designed to prohibit; placing the assets of a financially ailing corporation where insiders can reach them, but creditors cannot. Repeatedly, the courts have had occasion to condemn as fraudulent conveyances security interests which insiders have acquired in the assets of a financially-ailing corporation under circumstances similar to those present here. *M. V. Moore & Co. v. Gilmore*, 216 F. 99 (4th Cir. 1914); *In re Atlas Foundry Co.*, 155 F.Supp. 615 (D.N.J.1957); *Duberstein v. Werner*, 256 F.Supp. 515 (E.D.N.Y.1966); *In re Roco Corp.*, 15 B.R. 813, 8 B.C.D. 582, 5 C.B.C.2d 921 (Bkrtcy., D.R.I.1981). *See also In re College Chemists, Inc.*, 62 F.2d 1058 (2d Cir. 1933); *Lytle v. Andrews*, 34 F.2d 252 (8th Cir. 1929).

## II.

## THE RELEVANT STATUTES

The trustee in bankruptcy is invoking 11 U.S.C. §§ 544 and 548.

Section 548 replaces § 67d of the Bankruptcy Act, which, in turn, was derived largely from the Uniform Fraudulent Conveyance Act.[8] Only transfers made within one year of the date of the filing of the petition may be challenged under § 548. Subsection (a) of § 548 consists of an intro-

duction followed by four substantive paragraphs which replace the substance, respectively, of §§ 4, 5, 6, and 7 of the Uniform Fraudulent Conveyance Act. 4 *Collier on Bankruptcy* ¶ 548.02[1], at 548–22 (15th ed. 1982).[9]

Section 544 of the Code imports state law into the Code and gives the trustee in bankruptcy " 'every right and power which is conferred by the law of the state upon its most favored creditor who has acquired a lien by legal or equitable proceedings.' " 4 *Collier on Bankruptcy* ¶ 544.02, at 544–5, quoting *In re Waynesboro Motor Co.*, 60 F.2d 668, 669 (S.D.Miss.1932) (Holmes, J.).

In 1925, New York adopted the Uniform Fraudulent Conveyance Act, which is now to be found in §§ 270–281 of the Debtor and Creditor Law of New York. These provisions parallel 11 U.S.C. § 548(a), but go further and authorize the recovery of reasonable attorneys' fees where a conveyance is found to have been "made by the debtor and received by the transferee with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud * * * creditors." New York Debtor and Creditor Law § 276–a. A trustee in bankruptcy is specifically named in the New York statute as entitled to recover such attorneys' fees. *Id.*

Both state and Federal law make voidable any transfer accomplished with an actual fraudulent intent. Both also make vulnerable transfers for less than a reasonably equivalent value under certain conditions, despite lack of an actual intent to defraud. A transfer for less than a reasonably equiv-

---

8. Section 548(a) provides:

"The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor—

"(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer occurred or such obligation was incurred, indebted; or

"(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

"(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

"(ii) was engaged in business, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

"(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured."

9. Hereinafter, all citations in this section to *Collier on Bankruptcy* will be to the 15th edition (1982) of that treatise.

182

alent value is fraudulent when the debtor "was insolvent" on the date the transfer was made or became insolvent as a result (11 U.S.C. § 548(a)(2)(B)(i); Debtor and Creditor Law § 273), or was engaged in business for which any property remaining "was an unreasonably small capital" (§ 548(a)(2)(B)(ii); Debtor and Creditor Law § 274), or intended to incur debts that would be beyond the debtor's ability to pay as such debts matured (§ 548(a)(2)(B)(iii); Debtor and Creditor Law § 275).

■ Under all four tests, the creation of a second mortgage and the transfer of the life insurance policies constitute fraudulent conveyances.

## III.

### FRAUDULENT INTENT

By necessity, fraudulent intent is not susceptible of direct proof. As Judge Edward Neaher has pointed out in an analogous connection:

"The analysis begins with a statement of the obvious. Persons whose intention it is to shield their assets from creditor attack while continuing to derive the equitable benefit of those assets rarely announce their purpose. Instead, if their intention is to be known, it must be gleaned from inferences drawn from a course of conduct. *In re Saphire*, 139 F.2d 34, 35 (2 Cir. 1943); *In re Freudmann*, 362 F.Supp. 429 (S.D.N.Y.1973), *aff'd*, 495 F.2d 816 (2 Cir. 1974)." *In re Vecchione*, 407 F.Supp. 609, 615 (E.D.N.Y. 1976).

Furthermore, as this Court noted in *In re Checkmate Stereo and Electronics, Ltd.*, 9 B.R. 585, 612 (Bkrtcy.E.D.N.Y.1981), *mod. and aff'd*, 21 B.R. 402 (E.D.N.Y.1982):

"The facts are not to be atomized. Where a transfer is only a step in a general plan, the plan 'must be viewed as a whole with all its composite implications.' *Buffum v. Peter Barceloux Co.*, 289 U.S. 227, 232, 53 S.Ct. 539, 541, 77 L.Ed. 1140 (1933); *Shapiro v. Wilgus*, 287 U.S. 348, 353, 53 S.Ct. 142, 143, 77 L.Ed. 355 (1932). A 'clear pattern of purpose-

ful conduct' will support 'a finding of actual intent to defraud.' *In re Freudmann*, 495 F.2d 816, 817 (2d Cir. 1974), *cert. denied sub nom. Freudmann v. Blankstein*, 419 U.S. 841, 95 S.Ct. 72, 42 L.Ed.2d 69 (1974)." 9 B.R. at 612–13.

The authoritative text on bankruptcy, *Collier on Bankruptcy*, states that "the finding of the requisite intent may be predicated upon the concurrence of facts which, while not direct evidence of actual intent, lead to the irresistible conclusion that the transferor's conduct was motivated by such intent. Rarely will a fraudulent transferor disclose his fraudulent intent in a mode capable of direct proof. Unless the clause [§ 548(a)(1) ] is to have a severely restricted scope, it would seem to cover cases where the trustee shows that the transferor acted under circumstances that preclude any reasonable conclusion other than that the purpose of the transfer was fraudulent as to his creditors." 4 *Collier on Bankruptcy* ¶ 548.02[5], at 548–33–34.

■ Among the badges of fraud are "the existence of an unconscionable discrepancy between the value of property transferred and the consideration received therefor * * * [or] the fact that the transferee was an officer or was an agent or creditor of an officer of an embarrassed corporate transferor." *Id.* at 548–37–38. Where the transferee is in a position to dominate or control the debtor's disposition of his property, the transferee's intent to hinder, delay, or defraud creditors may be imputed to the debtor. 4 *Collier on Bankruptcy* ¶ 548.-02; *In re Roco Corp., supra*, 15 B.R. at 817, 8 B.C.D. at 585, 5 C.B.C.2d at 927–28.

In mid-1979, Vaniman was in grave—and probably terminal—financial difficulty. At the time of the transaction here involved, it had been losing money on its operations for over two years; it owed its last successful year to a contract secured through commercial bribery; its chief executive officer would shortly plead guilty to perjury; in order to pay its real estate taxes and meet its payroll, it had been forced to borrow money from its stockholders and an employee; and many of its creditors had not been paid for over a year.

Its liabilities were many, and its assets were few and far from liquid. Its biggest asset was the real estate from which it conducted its business: the building and the land on which it stood. Vaniman's inventory, while valuable, was not salable; its accounts receivable turned out to be only partially collectible; and most of its machinery and equipment was many years old.

Vaniman's troubles were not of recent origin, nor its causes past: Vaniman's sales had been declining steadily for a period of two years, and Vaniman was being adversely affected by the poor market for vehicles generally. Also, it could not but be hurt by the involvement of its chief executive officer in an investigation of commercial bribery.

Pirrone and James Martin, knowing better than anyone else how desperate the situation of Vaniman was, used their control over the corporation to obtain for themselves what assets remained to Vaniman. This was a clear abuse of their position, making what they did fraudulent as to creditors and voidable by the trustee in bankruptcy.

When James Martin, a man whose expertise lay in finance, arranged for the placement of a second mortgage in favor of himself and Pirrone on the single significant asset of the corporation which they jointly controlled, both men necessarily knew that what they were doing would take Vaniman's assets out of the reach of Vaniman's creditors and preserve those assets for themselves, and they intended this result.

The lameness of the explanation offered by James Martin for the use made of Jack Martin negates any other view of the facts. According to James Martin, he and Pirrone were tired and wished, for personal reasons, to relinquish to a younger and more vigorous man the operation of the enterprise they had been jointly conducting (883). But, under the employment agreement which Pirrone's lawyers drew up as part of the sale to Jack Martin, Pirrone committed himself to appear at Vaniman's premises on a daily basis without even vacation periods, doing what he had always done for Vaniman. Indeed, every indication from the record is that the transactions of September 4 made no difference whatsoever in Pirrone's involvement with Vaniman: he continued to occupy the same office, solicited orders, borrowed money, and acted as signatory on the checking account. To describe the events of September 4, therefore, as being the result of an effort to disengage James Martin and Pirrone from the obligations of management is inconsistent with the facts.

Nor is there any more substance to the implication that the purpose was to benefit Vaniman and restore it to health. As both men had more reason to know than anybody else, what this required, above all, was an infusion of new money which Jack Martin, a penniless young man with a negative credit rating, was peculiarly unable to secure. Furthermore, it could not but have been evident to these two experienced businessmen that Jack Martin, with his limited education and experience, was wholly incapable of taking over the reins of management, and could only lead Vaniman into further difficulties. Jack Martin to his credit frankly acknowledged on the witness stand his total lack of qualifications, manifested several times in his answers to questions probing events during the period he theoretically was in control of the company.[10]

10. When asked to pinpoint the time when he became familiar with the business in which Vaniman was engaged, the installation of truck bodies, Martin replied: "I couldn't put a time when I became qualified. I may not be qualified now." (852.) His responses confirmed this self-assessment. He was unable to estimate the profits to Vaniman from the Ford order, one of the three on hand when he bought Vaniman's stock (852), nor could he state what was charged Lilco per vehicle on another order, or the amount of labor required, beyond saying: "[T]he labor was unbelievable * * * I would say [it took] hundreds [of hours]," explaining: "Mr. Kral is not here, available to me, but he was taking care of that whole order, himself" (850–51). When a question arose during his presidency with respect to an order from GM that was large "by Vaniman's standards," he was completely lost because "Mr. Pirrone was

Not only did Pirrone and Martin put an unqualified man at the helm of Vaniman, but they simultaneously stripped it of possible sources of the capital it needed to operate by transferring to themselves the life insurance policies which had some surrender value, and by creating a second mortgage on Vaniman's real estate, thereby foreclosing from Vaniman the ability to raise the capital by mortgaging that property itself in return for additional financing.

In evaluating the intent underlying the transactions which took place on September 4, 1979, events subsequent to that date are also relevant.

The demise of Vaniman was virtually assured when James Martin and Pirrone, after the Hempstead Bank loan was paid, brought on their proceeding to foreclose the mortgage they held on Vaniman's real estate. When Vaniman turned to the bankruptcy court for relief, they terminated whatever small chance Vaniman might have had to rehabilitate itself by seeking relief from stay so they could proceed to foreclose the mortgage they held on the real estate, without which Vaniman could not operate.

Nothing in their actions has been consistent with the desire to preserve Vaniman as a going enterprise and protect its creditors; everything both men have done demonstrates a determination to salvage for themselves, without regard to the rights of creditors, what little Vaniman had in the way of assets on September 4, 1979.

Although fraudulent intent is a matter of fact and no two cases are exactly alike, such intent has been found by other courts in circumstances very similar to those present here, where a transferee in a position to dominate or control the debtor's disposition of its property has arranged for the corporation to incur an obligation many times greater than any benefit received, the result of which was the corporation's insolvency. *Duberstein v. Werner, supra,* 256 F.Supp. at 520; *In re Roco Corp., supra,* 15 B.R. at 817, 8 B.C.D. at 585, 5 C.B.C.2d at 927.

In *Duberstein v. Werner, supra,* 256 F.Supp. at 520, District Judge Bartels found an intent to hinder, delay, and defraud existing and future creditors of the corporation there involved, Raywal, Inc., in the execution and delivery of a chattel mortgage to a controlling stockholder, officer, and director "to secure an antecedent debt of doubtful legitimacy at a time when the corporation was insolvent and when he had knowledge of that fact." The facts here are even stronger, since the mortgage was issued primarily to secure a debt that was not even that of the corporation, but was created simultaneously with the execution of the mortgage. Whether or not technical insolvency has been proved beyond peradventure, Vaniman was a basket case on September 4, 1979, as no one knew better than the two men who arranged this non-arm's-length transaction.

*In re Roco Corp., supra,* involved a sale of all the issued and outstanding capital stock of Roco back to the corporation, in exchange for which Roco issued its promissory note for $300,000, plus a second note for a prior loan. As collateral for both loans, Roco gave the sellers a security interest in Roco's receivables, inventory, and equipment. The same date, the son of the two stockholders purchased from the corporation for $3,000 one share of its stock, thereby becoming its sole stockholder and also its only officer and director. Due to mismanagement, the corporation went into bankruptcy. The former stockholders then brought an action seeking relief from the automatic stay so they could foreclose on their security interest. The bankruptcy court, after pointing out that Roco incurred an obligation ($300,000) one hundred times greater than the benefit received ($3,000), continued:

"The negotiations leading to this obligation and transfer were not at arm's length, and the result of these dealings was Roco's insolvency. Based on these facts, the court concludes that the execution of the $300,000 note was an effort to

in Florida. He had all the papers with him of

the prices on it." (666.)

hinder, delay or defraud Roco's creditors and was therefore a fraudulent transfer." 15 B.R. at 817, 8 B.C.D. at 585, 5 C.B.C.2d at 927–28.

■ Where a conveyance is made with actual intent to hinder, delay, or defraud creditors, it is not necessary to show that the debtor was insolvent for the conveyance to be voidable as fraudulent. This is as true under the Code and New York's present statute, as under prior law. *Vollkommer v. Cody*, 177 N.Y. 124, 130, 69 N.E. 277 (1904); *Carstairs v. Spear*, 201 A.D. 418, 421, 194 N.Y.S. 134 (1st Dep't 1922).

Whichever of Vaniman's assets were conveyed to James Martin and Joseph T. Pirrone after August 1, 1979, and whatever obligations were incurred by Vaniman toward these men, were tainted by being part of the same overall scheme to hinder, delay, and defraud the creditors of Vaniman. Accordingly, equity requires that everything that was done be undone.

## IV.

### CONSTRUCTIVE INTENT

The mortgage and the various transfers to James Martin and Joseph T. Pirrone were fraudulent conveyances, even if intent to defraud had been lacking, because they were all constructively fraudulent. Vaniman received no consideration for its undertaking to guarantee the payment of $125,000 to Martin and Pirrone for their stock; it received no consideration for the transfer to Martin and Pirrone of the insurance policies on their lives; except for the fact that there allegedly existed antecedent debts to Martin and Pirrone in the amount of $33,857.63, Vaniman received no consideration for the second mortgage it gave these men in the amount of $158,857. In the words of the Code, Vaniman received "less than a reasonably equivalent value" in exchange for the property transferred and the obligation incurred. 11 U.S.C. § 548(a)(2)(A). The "value of what the *bankrupt* actually received was disproportionately small compared to the value of what it gave." (Emphasis in original.) *Rubin v. Manufacturers Hanover Trust Co., supra*, 661 F.2d at 993. The result was that Vaniman (a) became insolvent (§ 548(a)(2)(B)(i)), (b) was left with an "unreasonably small capital" for the business in which it was engaged (§ 548(a)(2)(B)(ii)), and (c) would necessarily incur "debts that would be beyond the debtor's ability to pay as such debts matured" (§ 548(a)(2)(B)(iii)). Since the transfers were made, and the obligations all incurred, within one year before the date of the filing of Vaniman's petition under Title 11, they are all fraudulent transfers and obligations as a matter of law.

Vaniman was rendered insolvent because increasing its liabilities on September 4, 1979 by $125,000 resulted in its liabilities exceeding its assets. This is the test of insolvency, both under the Code (11 U.S.C. § 101(26)) and the New York Debtor and Creditor Law § 271(1). The Code defines "insolvent" as a financial condition in which the sums of an entity's debts is greater than that of "all of such entity's property, at a fair valuation." 11 U.S.C. § 101(26)(A). The term "fair valuation" appears to be synonymous with the Act's "present fair salable value" of a debtor's property (§ 67d(1)(d)), which the Second Circuit has held to mean "market value." *Rubin v. Manufacturers Hanover Trust Co., supra*, 661 F.2d at 995.

Placing the most generous value on Vaniman's assets, it was barely solvent prior to the creation of the second mortgage on its property. That mortgage, by increasing its liabilities by $125,000, plunged it into insolvency. Therefore, both under the Code, and under New York Debtor and Creditor Law, whatever was transferred to Martin and Pirrone subsequent to September 4, 1979, except whatever salary was paid Pirrone, was in fraud of creditors.

In fact, it was not necessary for the trustee to prove that Vaniman was rendered insolvent, if it was not already insolvent, by the events of September 4, 1979. The transfer of the life insurance policies and the creation of a second mortgage at least to the extent of $125,000 were entirely gratuitous. As the Second Circuit noted in

*Feist v. Druckerman*, 70 F.2d 333, 334 (2d Cir. 1934):

"Now, there is a rule of long standing in the New York courts that a *voluntary* conveyance made when the grantor is indebted is presumptively fraudulent. We think this means that, if one indebted makes such a transfer, it is presumed, in the absence of some proof to the contrary, that he was then insolvent." (Emphasis in original.)

Among the cases cited by the Second Circuit was *Ga Nun v. Palmer*, 216 N.Y. 603, 611–12, 111 N.E. 223 (1916), in which Judge Cardozo wrote:

"The rule is that a transfer without consideration by one who is then a debtor raises a presumption of fraud. The creditor may stand upon that presumption until it is repelled. It is not for him to show what other property was retained. * * * The transfers may, of course, have been fraudulent even though there was a consideration. Their validity turns then upon the intent with which they were given or received. If, however, there was no consideration, the fraudulent purpose, in the absence of explanation, is an inference of law." (Citations omitted.)

James Martin and Pirrone failed to prove that Vaniman was solvent on September 4, 1979. They gave no explanation for the voluntary transfer to them of the life insurance policies, nor any adequate explanation for the creation of a second mortgage. On these grounds, therefore, as well, the trustee is entitled to prevail.

Independent of the fact that the September 4, 1979 transaction rendered Vaniman insolvent, it also left the corporation with an unreasonably small capital and put it in a position in which it would necessarily incur expenses it could not meet.

Placing a second mortgage on Vaniman's real estate left Vaniman with a minus capitalization. It closed off the one possible source of funds to a company whose current liabilities far exceeded its current assets. Necessarily, therefore, the transaction left Vaniman with inadequate capital.

Four-square authority establishing the fraudulent character of the plaintiffs' second mortgage is *In re College Chemists, Inc.*, 62 F.2d 1058 (2d Cir. 1933), which also answers plaintiffs' contention that Vaniman's capital was not depleted by the second mortgage because no transfer of cash was involved. There, the sole stockholder, Diller, sold all his stock to one Weiner, taking back as security a chattel mortgage on all the corporation's assets. The assets had a value of less than the purchase price. Subsequently, the corporation went into bankruptcy. The Second Circuit affirmed the conclusion reached by the bankruptcy referee that the security interest was voidable, under § 274 of the Debtor and Creditor Law of New York, one of the statutes relied on by the trustee in this proceeding. The Court said:

"The property remaining in the bankrupt's hands was 'an unreasonably small capital'; indeed there was no capital at all, because Weiner's debt was more than its value. There was indeed a consideration to support the contract as between Diller and Weiner, Diller's transfer of the shares to him; but this was not a 'fair consideration' under section 272. The consideration must be 'in exchange' for the property conveyed. The bankrupt did not, and of course could not, receive its own shares in exchange for its property. The shares passed to Weiner, and the result of the transaction was merely to give back to Diller the whole capital of the corporation, allowing Weiner to carry on the business on an expectancy of profit." 62 F.2d at 1058.

Similarly, in this case, the second mortgage left Vaniman with "no capital at all," with the result that Jack Martin thereafter was doing no more than "carry[ing] on the business on an expectancy of profit," an expectancy which, in light of Vaniman's record, was wholly illusory. Section 274 of New York's Debtor and Creditor Law parallels § 548(a)(2)(B)(ii) of the Bankruptcy Code.

James Martin and Pirrone also knew when they arranged the transfer of the life

insurance policies and the creation of a second mortgage that Vaniman would be incurring debts that it could not meet. Since Jack Martin had no assets or credit of his own, he could only pay James Martin and Pirrone in accordance with the Purchase Agreement out of the resources of Vaniman. He either had to generate funds by completing the contracts on hand, or borrow money, or do both. For Vaniman to complete its contracts, it would have to incur obligations for materials and labor. Both James Martin and Pirrone knew from Vaniman's losses during the preceding two years that Vaniman would be unable to repay these obligations. What has occurred is exactly what could have been expected. Vaniman, in order to complete the contracts on hand, borrowed money from its employees, which has never been repaid. It has failed even to remit the taxes it withheld from its employees' wages. These subsequent creditors are the intended beneficiaries of the law here involved.

In holding the September 4, 1979 transactions to constitute fraudulent conveyances, this Court is not breaking any new ground. The precedents are many and far from recent. In *M. V. Moore & Co. v. Gilmore*, 216 F. 99 (4th Cir. 1914), the bankruptcy court was sustained in disallowing three notes and a deed of trust given to secure their payment under circumstances similar to those present here. There, the corporation, at a time when its assets were just in equilibrium with its liabilities, but it was experiencing grave financial difficulties, bought back his shares from a majority shareholder for $2,000, of which $1,500 consisted of notes secured by a deed of trust covering all its assets. Three months later, the corporation was adjudicated a bankrupt. The Fourth Circuit held the mortgage and the notes to be void as arising from a transaction which was fraudulent as to creditors as a matter of law:

> "The vice of the transaction under review is not found in dishonest intention on their [the buyer and seller of the majority stock] part, but in the distressed situation of the company which operated as a matter of law to make what they did a fraud

upon creditors. Without adding a dollar to the assets they increased the liabilities some 20 per cent, and got security for the debt so created by a pledge of all the property of the corporation. The necessary effect of this arrangement was to make the concern hopelessly insolvent. The stock they parted with was valueless, and the notes they took had no valid consideration.

> "To uphold the transaction here disclosed, however free from moral delinquency, and thereby give preference over other creditors to these majority stockholders whose debt is the purchase price of their own shares sold to the corporation itself, when its condition was manifestly precarious, to say the least, would be so contrary to good conscience and common sense that no argument is needed to show that it ought to be condemned. The members of appellant's firm were bound to know, as the event proved, that the concern was on the verge of failure, and the law forbade them to deplete the assets, which belong in equity to the creditors, for the purpose of recovering some part of an otherwise lost investment." 216 F. at 101.

The facts here are similar to, but even more egregious than, those present in *In re Atlas Foundry Co.*, 155 F.Supp. 615 (D.N.J. 1957). Before the District Court for review in that case was an order by the referee in bankruptcy adjudging a mortgage invalid as against the bankrupt's trustee. As the referee phrased the question for review, it was:

> "May stockholders of a corporation, through use of a fictitious consideration, obtain a mortgage on the realty of the corporation as part consideration for the sale of their shares of stock in the corporation?" 155 F.Supp. at 616.

To this question, the court answered with a strong and sharp negative. Yet, from the viewpoint of the trustee, the facts in that case were far weaker than those present here. The corporation there involved was cash rich, and there is no indication from the record that it was insolvent prior to the

sale of its stock by their shareholders, a single family, named Bornstein. Like Jack Martin in this case, the purchaser there, a corporation, C. A. Goldsmith Company, and its stockholders, Ehrlich and Goldfinger, had no funds, and used the assets of Atlas to finance the acquisition. What Goldsmith did was borrow $250,000 which it then lent to Atlas, receiving back a note and a mortgage in this amount. This note and mortgage then became part of the $650,000 paid the former stockholders for their stock. As soon as the new owners succeeded to the stock, they withdrew the amount earlier lent Atlas, and repaid the bank from which the money had originally been procured. They further reduced Atlas' bank balance in order to repay the balance of the monies which they had borrowed to finance the purchase. These transactions "so burdened Atlas with debts and so weakened its cash position that some form of insolvency proceeding became inevitable and on December 23, 1953 it filed a petition for an arrangement under Chapter XI of the Bankruptcy Act." 155 F.Supp. at 617. As in this case, the Chapter 11 was soon succeeded by an adjudication in bankruptcy and the sale of the real estate subject to the mortgage, leaving for decision the validity of the lien of the former owners. District Judge Wortendyke, after summarizing these facts, continued:

> "The Referee correctly concluded that the mortgage in question is invalid against the Trustee of the bankrupt because its execution by the bankrupt and acquisition by the present holders was achieved with the knowledge and collusive cooperation of such holders by way of circumvention of the legal obstacle prohibiting the bankrupt from mortgaging its assets to pay its stockholders for their stock." *Ibid.*

Indeed, in this case, the bankrupt did mortgage its assets to pay its stockholders for their stock. Moreover, Atlas was not insolvent, and did not become insolvent "until after the mortgage was executed, delivered and assigned" (155 F.Supp. at 618), and would not have become insolvent but for the deliberate depletion of its assets by the purchasers. In this case, Vaniman became insolvent as soon as the mortgage was executed, as James Martin and Pirrone necessarily knew, so that the creation of a lien on Vaniman's sole asset was necessarily in fraud of creditors. In terms of *Atlas*, this is an *a fortiori* situation.

The controlling principles were succinctly stated by the highest court of the State of New York more than one hundred years ago in *Carpenter v. Roe*, 10 N.Y. 227 (1851), involving the transfer by a produce merchant of certain real estate to his wife shortly before he became insolvent in consequence of a sudden fall in the price of grain. Holding the deed to Roe's wife to be void as in fraud of creditors, the Court of Appeals said:

> "To avoid the conveyance and trust to and in favor of his wife, it was not necessary that the debtor should be insolvent, or believe himself to be so, when they were executed or created. It was sufficient, that he was indebted, and that insolvency would be the inevitable or probable result of want of success in a business in which he was engaged. He could not, legally or honestly, in this manner provide for himself or family, and cast upon his creditors the hazard of his speculation." 10 N.Y. at 231–32.

## V.

## PREFERENTIAL TRANSFER

### A. *The Relevant Statutes*

Section 547 of the Code authorizes a bankruptcy trustee to avoid any transfer of property of the debtor for the benefit of a creditor on account of an antecedent debt made while the debtor was insolvent within one year of the filing of the petition to an insider who had reasonable cause to believe that the debtor was insolvent, if such transfer enables the creditor to receive more than he would in liquidation. The trustee invokes this section with reference to so much of the mortgage as exceeds the purchase price of the stock, the life insurance

policies, and the cash value of the surrendered life insurance policies.[11]

■ Since the Court has already held the second mortgage in its entirety and the transfer of the policies to have been fraudulent conveyances, their status as preferences need not be reached. That they were such, however, appears indisputable in this record. As of September 4, 1979, James Martin and Pirrone fit squarely into the Code's definition of insiders (§ 101(25)(B)).[12] Pirrone was an officer both before and after September 4, 1979; both he and James Martin were directors, officers, and in control of Vaniman when the transfers were arranged. That they ceased to be such simultaneously with the transfers is of no significance. To give that fact any weight would elevate form over substance. Accordingly, whatever they received in payment of any antecedent indebtedness by way of the value transferred or obligation created within one year prior to July 11, 1980 was a preferential payment, and, therefore, voidable by Vaniman's trustee in bankruptcy.

## VI.

## THE ALLEGED LOSS AND WASTE OF CORPORATE ASSETS

The trustee's counterclaim alleges that Pirrone and Martin are personally liable to the estate of Vaniman for the monies paid CP&T Sales Co. as a bribe on the ground that such payment constituted a breach of the plaintiffs' fiduciary duty to Vaniman, for which they should be held liable under § 541(a)(1) of the Bankruptcy Code and New York Business Corporation Law § 720(b). The trustee's theory is that § 720(b) creates a cause of action in Vaniman against its directors for "loss or waste of corporate assets" (New York Business Corporation Law § 720),[13] to which Vaniman's trustee succeeded by virtue of 11 U.S.C. § 541(a)(1).[14]

■ For a number of reasons, this Court will not compel Vaniman's former officers and directors to turn $35,000 over to the trustee in bankruptcy based on events that took place four years before Vaniman filed for relief under the bankruptcy laws and while Vaniman was still a solvent corporation. Although § 720 of New York's Business Corporation Law explicitly authorizes suit by a trustee in bankruptcy, it is well settled that his complaint must show that there are creditors in existence who were such at the time of the alleged wrongful acts or that such acts had as their purpose to defraud present or future creditors. *Lummis v. Crosby*, 176 App.Div. 315, 162 N.Y.S. 444 (2d Dep't 1916), 181 App.Div. 884, 167 N.Y.S. 1111 (2d Dep't 1917), *aff'd*, 224 N.Y. 611, 121 N.E. 876 (1918); *Garrison v. Pope*, 130 Misc. 290, 223 N.Y.S. 737 (Sup. Ct.N.Y.Co.1927); 15 *N.Y.Jur.2d* Business Relationships § 1065. No such allegations were made or proved.

11. The trustee has apparently elected not to attempt to recover as preferences the post-September 4, 1979 payments made Pirrone.

12. Section 101(25)(B) defines an "insider" as: "(B) if the debtor is a corporation—(i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor."

13. Section 720 of the New York Business Corporation Law provides in pertinent part:
"(a) An action may be brought against one or more directors or officers of a corporation to procure a judgment for the following relief:
"(1) To compel the defendant to account for his official conduct in the following cases:
"(A) The neglect of, or failure to perform, or other violation of his duties in the management and disposition of corporate assets committed to his charge.
"(B) The acquisition by himself, transfer to others, loss or waste of corporate assets due to any neglect of, or failure to perform, or other violation of his duties.
"(2) To set aside an unlawful conveyance, assignment or transfer of corporate assets, where the transferee knew of its unlawfulness.
"(b) An action may be brought for the relief provided in this section * * * by a * * * trustee in bankruptcy * * *."

14. Section 541(a)(1) of the Bankruptcy Code provides that the bankruptcy estate shall consist of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).

Neither Vaniman, nor its then creditors, suffered any prejudice from the Colletti deal. Deplorable as commercial bribery may be, it is undisputed that the $35,000 paid Colletti's company secured a contract for Vaniman from which it derived a profit of $220,000 (383–86). Had Colletti not been paid what he demanded, Vaniman would not have received the business which gave it its profit for 1976.

On the merits, the payments exacted by Colletti could only be deemed to constitute loss or waste of corporate assets if such opprobrium attaches to commercial bribery that, whatever its results, a director or officer who engages in it becomes personally responsible for the amount paid.

No such *per se* rule exists in New York. Instead, the New York Courts have adopted a case-by-case approach. Instructive in this connection is *Hornstein v. Paramount Pictures, Inc.*, 22 Misc.2d 996, 37 N.Y.S.2d 404 (Sup.Ct.N.Y.Co.1942), *aff'd*, 266 App.Div. 659, 41 N.Y.S.2d 210 (1st Dep't), *app. denied*, 266 A.D. 828, 43 N.Y.S.2d 751 (1st Dep't 1943), *aff'd*, 292 N.Y. 468, 55 N.E.2d 740 (1944). There, the court ruled:

"[A] payment of corporate funds by way of submission to an illegal exaction is not *ipso facto* or necessarily a diversion of such funds from legitimate corporate purposes and consequently is not *ipso facto* or necessarily a breach of the implied trust upon which such funds are held. Whether or not in any particular instance there should be submission and payment or stout resistance thus necessarily must rest in the discretion of the persons constituting the management of the corporation like other business questions in general, and while abuses of that discretion undoubtedly may be reviewed and corrected by the courts, it would require

something more than the mere fact of the submission and payment to call forth an exercise of the court's power * * *." 22 Misc.2d at 1008–09, 37 N.Y.S.2d at 417.

Present here is no more than "the mere fact of the submission and payment." Pirrone and Martin agreed on the payments demanded by Colletti only after Colletti made it clear that if Vaniman wanted the contract for which it had bid in good faith, they had no alternative but to pay the amount demanded. Pirrone was not the instigator, but the victim.

The two cases relied upon by the trustee, both brought by stockholders, are not in point. They do not hold that bribery automatically gives rise to an action for waste. In *Roth v. Robertson*, 64 Misc. 343, 118 N.Y.S. 351 (Sup.Ct. Erie Co. 1909), the purpose of the bribe was to ensure the continued operation of the corporation's business in violation of the Sunday blue laws, an illegal objective. 64 Misc. at 344–45, 118 N.Y.S. at 352–53.[15] In contrast, Vaniman's objective—to secure a business contract—was wholly legal.

*Abrams v. Allen*, 297 N.Y. 52, 74 N.E.2d 305 (1947), is even more remote. *Abrams* concerned the sufficiency of a pleading alleging the dismantling and removal of corporate plants and the intentional curtailment of production for the sole purpose of "discourag[ing], intimidat[ing] and punishing" the corporation's employees during a labor dispute." 297 N.Y. at 55, 74 N.E.2d 305.[16]

But the question is not whether in 1976, when the payments were made, Vaniman's minority stockholders had a possible cause of action for waste, but whether in 1980, Vaniman's trustee in bankruptcy does. And it seems clear that the courts of New

---

**15.** The *Roth* decision has been characterized as "[a] relatively pure—and rare—expression of the interventionist style" of judicial review of corporate decision making. *See* Stone, "The Place of Enterprise Liability in the Control of Corporate Conduct," 90 *Yale L.J.* 1, 60 n.230 (1980).

**16.** *In re Leasing Consultants, Inc.*, 592 F.2d 103 (2d Cir. 1979), is also not apposite. In that case, it was not the bribery *per se* that gave rise to a right of recovery by the bankruptcy trustee against the recipient of a bribe, by extension of § 720 of New York's Business Corporation Law, but that the payments were made in furtherance of a conspiracy to violate 18 U.S.C. § 203, a criminal statute relating to conflict of interest.

York, whose responsibility it is to interpret the law of that State, have determined that absent proof of an existing creditor, who was such at the time of the alleged misfeasance, a trustee in bankruptcy has no cause of action. *Lummis v. Crosby, supra.*

The soundness of that rule in this case is clear. In 1976, when the payments were made, Vaniman's *then* creditors were only benefited; its subsequent creditors, who the trustee now represents, were in no way affected. As for Vaniman's stockholders, officers, and directors, and the corporation itself, James Martin and Pirrone were virtually the corporation in 1976, and when they subsequently, sometime prior to September 4, 1979, acquired the few shares they did not already own, there ceased to be anyone who could complain of what they earlier had done with the corporation's funds. 14 *N.Y.Jur.2d* Business Relationships §§ 633, 637; 15 *N.Y.Jur.2d* Business Relationships § 1062.

That in 1980, Vaniman, for reasons not directly related to the bribe, found itself in the bankruptcy court, should not operate retroactively to create a cause of action where none before existed.

Although commercial bribery is not to be encouraged, it is not the function of the bankruptcy law to provide sanctions which would be unavailable if insolvency had not supervened. Therefore, no judgment will be entered against plaintiffs based on the improper payments exacted by Colletti long prior to bankruptcy.

## VII.

### EVIDENTIARY QUESTIONS

A. *Brady's Financial Statements*

The certified public accountant, John F. Brady, who had prepared financial state-

ments for Vaniman for many years preceding its bankruptcy, and up to, and including, August 31, 1979, died about a year before the matter came for trial without his testimony having been perpetuated by means of a deposition. Although counsel for Pirrone and Martin had stipulated that despite Mr. Brady's demise, the financial statements he had prepared for the fiscal years ending December 31, 1977, December 31, 1978, and the eight months terminating August 31, 1979 would be admitted, the stipulation was withdrawn on the eve of the trial, forcing the trustee to attempt to lay a foundation for the admissibility in the absence of the man who had prepared them. Not only was Mr. Brady dead, but counsel for the trustee stated on the record, without contradiction, that Mr. Brady's office no longer existed.

■ The evidence established that the financial statements for fiscal years 1977 and 1978 had been given by Pirrone to Cote and Jack Martin when he was negotiating with them with respect to the sale of the Vaniman stock (613–15, 122–23; DX–E, ¶ 3.3.1). They had also been given to other potential buyers of Vaniman's assets or business (420–21), and were supplied upon request to the bank with which the company was dealing (78–79). Pirrone had likewise arranged to make the 1979 financial statement available to potential investors. Accordingly, the Court held that these statements could be received as admissions against interest against not only Pirrone, but also against James Martin because of their unity of interest.[17] The record compels the inference that in his dealings with Jack Martin, Pirrone was acting for his partner, James Martin, as well as himself.

In *United States v. Feinberg,* 140 F.2d 592 (2d Cir.), *cert. denied,* 322 U.S. 726, 64

---

**17.** The common law rule respecting admissions is codified and liberalized by Rule 801(d) of the Federal Rules of Evidence, which provides:

"A statement is not hearsay if— * * *

"(2) * * * The statement is offered against a party and is (A) his own statement, in either his individual or a representative capacity or (B) a statement of which he has manifested his adoption or belief in its truth, or (C) a

statement by a person authorized by him to make a statement concerning the subject, or (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship, or (E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy."

S.Ct. 943, 88 L.Ed. 1562 (1944), Judge Learned Hand held that a corporation's books of account were competent evidence against officers charged with misrepresenting its financial condition:

"When anyone makes statements as to the financial condition of a corporation, he implies that its books will bear out the truth of what he says, because his hearers will naturally assume that he is speaking of the books, these being ordinarily the only source of information. He is therefore in effect making a statement as to their contents and making them the test of the truth of his utterance." 140 F.2d at 596.

In *United States v. China Daily News, Inc.*, 224 F.2d 670 (2d Cir.), *cert. denied*, 350 U.S. 885, 76 S.Ct. 138, 100 L.Ed. 780 (1955), the Second Circuit, following this case, held that the books of *China Daily News*, of which the defendant Moy was Managing Editor and Chairman of the Board, were admissible against him to prove prohibited financial transactions. *United States v. Tellier*, 255 F.2d 441, 448 (2d Cir.), *cert. denied*, 358 U.S. 821, 79 S.Ct. 33, 3 L.Ed.2d 62 (1958), elaborated on the principles laid down in *Feinberg* by holding that to make the books and records of a corporation admissible against those in control of that corporation, all that need be done is establish *prima facie* their genuineness.

So far as the 1977 and 1978 financial statements are concerned, they would also appear to be admissible under the business records exception to the ban against hearsay.[18] The plaintiffs' testimony that they were prepared annually by Brady in the regular course of Vaniman's business would appear to lay sufficient foundation for their admission.[19] *See, e.g., Fernandez v. Chios Shipping Co., Ltd.*, 542 F.2d 145, 154 (2d Cir. 1976).

Brady prepared these statements in accordance with standard accounting practices.[20] Richard E. Norton, a certified public accountant and a partner at Ernst & Witty, described the 1978 statement as "of reasonably good quality" and would accept it as a "sufficient financial statement" (787–88). The only significant criticisms levelled at these statements by the plaintiffs'· expert, Herbert L. Michaels, was that, ideally, Brady should have spent a longer time at the premises of Vaniman in preparing these statements, and should have himself determined the value of the inventory without relying on information supplied by Pirrone (1156–59, 1168–69).

These objections are not sufficient to support the statements' exclusion. The question is not whether the statements are the optimal product of the accounting profes-

---

18. Rule 803 of the Federal Rules of Evidence provides, insofar as relevant:

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness: * * *

"(6) *Records of Regularly Conducted Activity.* A memorandum, report, record * * * in any form, of acts, events, conditions * * * made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record * * * all as shown by the testimony of the custodian or other qualified witness * * *."

19. "Q [by Mr. Salomon] Do you recall testifying at a June 18th deposition?

"A [by James Martin] Yes.

* * * * * *

"Q * * * Do you recall being asked these questions and giving these answers, Mr. Martin?

* * * * * *

"QUESTION: 'But as to Exhibits A and C, did the company, as a continuing matter, request these exhibits to be furnished, in the ordinary course of its operations?'

"ANSWER: 'Well, that was part of our contract with Mr. Brady, that he provide us with annual financial statements.'

"QUESTION: 'These were received in the regular course of business, is that fair to say?'

"ANSWER: 'Yes.'

"Were you asked those questions and did you give those answers, sir?

"A Yes." (864, 869)

20. Pirrone's own testimony establishes that Brady visited Vaniman "about once a year" (377) to spot-check the inventory and examine the bookkeeping entries (85–86). Further, Pirrone acknowledged that he had "complete faith in [the accuracy of] Mr. Brady's financial statements * * *," at least until February, 1981 (72, 97; *see also* 495).

sion, but whether they can be deemed sufficiently probative as to warrant their admissibility. In view of Brady's long association with Vaniman, the statements' preparation need not necessarily have taken any significant time. As to the plaintiffs' second objection, they are not in a position to object to the utilization of figures supplied by themselves. To the extent that Brady departed from exemplary accounting procedures, these departures probably benefited Martin and Pirrone in their attempts to sell the company and are probably working to their advantage in this case.

■ Further, all the financial statements, including the 1979 statement, are admissible against both Martin and Pirrone under the omnibus exception to the hearsay rule.[21] Upon reflection, the Court has concluded that all the requirements of the exception are met here. The statements are internally consistent and correspond with Vaniman's books and records; they were not prepared in anticipation of litigation, but for business purposes, and no "reasonable efforts" will yield more probative evidence on such historical facts as the inventory on hand at Vaniman on September 4, 1979. To exclude them would frustrate, rather than serve, the interests of justice. ·

Before leaving the statements prepared by Brady, it merits noting that the efforts of James Martin to discredit the accuracy of the 1978 statement (1198–1203) were wholly ineffective. Vaniman's general ledger (DX–L) supports both the consultant's and accountant's fees shown on Exhibit C; Martin's inability to recall any legal services in 1978 conveniently blocks out the Grand Jury investigation that year into Vaniman's

payments to Colletti for its contract with the Ford Export Division.

## B. *The Fair Market Value of Vaniman's Realty on September 4, 1979*

A number of figures went into evidence bearing on the value of the Vaniman real estate in September, 1979. Based on the totality of that evidence, the Court has concluded that the property at that time did not have a fair market value in excess of $380,000.

In the view of the Court, the sale at auction of the property for $535,000 in February, 1981 under the auspices of the bankruptcy court after Vaniman was adjudicated is not a true indication of its value seventeen months earlier. Until recently, we have been living in inflationary times with steadily-appreciating real estate values.

On the other hand, the Court found unacceptable the value of $273,000 which a real estate expert put on the premises as of September 4, 1979 (1268–86; DX–W). That the property had a higher value is shown by the fact that a year earlier, on November 13, 1978, Vaniman had been offered $375,000 by its neighbor for whose use the property was ultimately purchased at the bankruptcy sale (PX–4). In determining market value, the Court has attached no weight to the letter of July 16, 1979 proposing a contract for $460,000 (PX–5). The offer was made contingent upon the availability of financing from the Job Development Authority, a contingency which might never be realized.

Finally, the wholehearted adoption by the plaintiffs of the value of $360,000 at the

---

**21.** Rule 804(b) of the Federal Rules of Evidence provides in pertinent part:

"The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: * * *

"(5) *Other Exceptions.* A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence

which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant."

hearing on October 15, 1980 on the complaint of Roslyn Savings Bank for relief from stay limits their ability now to claim a higher market value. *See* 1B *Moore's Federal Practice* ¶ 0.405[8], at 765 (2d ed. 1982); *see also Scarano v. Central Railroad Co.,* 203 F.2d 510, 513 (3d Cir. 1953); Beck, "Estoppel Against Inconsistent Positions in Judicial Proceedings," 9 *Brooklyn L.Rev.* 245 (1940). After Roslyn's expert had testified that the fair market value of Vaniman's real estate was $360,000, the following colloquy (made part of the record herein at 425–27) took place:

> "MR. FELDMAN: Your Honor, before you conclude * * *. I would, at least, at this time move and request that this Court deem the testimony as to valuation, that was taken in this court as to this particular hearing, be applicable *in my proceeding* on behalf of the subordinate mortgagees against the debtor. Because to bring in a witness again to testify as to valuation, I think would be an unnecessary and undue hardship, since we already have that testimony. The question as to the raised validity of the mortgage, is something that can be tried, of course, but as to valuation, can we have that testimony deemed applicable in the second proceeding, your Honor?
>
> \*   \*   \*   \*   \*   \*
>
> "THE COURT: All right, the Court will consider the testimony as to valuation given in the case of Roslyn Savings Bank against the debtor as part of the record of your action against Vaniman, Pirrone and Martin against Vaniman International.
>
> "MR. FELDMAN: Thank you, your Honor." (Emphasis supplied) (135–36)

■ The plaintiffs herein, having urged when it was to their advantage to do so that Vaniman's realty was worth no more than $360,000, are now judicially estopped from insisting on a higher value.

### C. *James Martin's Denial of Knowledge of the Ford Bribe*

Although James Martin has denied any knowledge that the contract with the Ford

Export Division was obtained only after Colletti had been promised a kickback (1204–05, 1221–22, 1232), the Court does not believe that Pirrone could or would have kept such an important fact a secret from his partner. The Court, therefore, credits Pirrone's original version that James Martin knew and authorized the payments to Colletti (231–32, 1217–18), although, like Pirrone, he was unhappy about their necessity.

### VIII.

### ATTORNEYS' FEES

■ Under § 276–a of New York's Debtor and Creditor Law, proof that a conveyance has been made with actual intent to hinder, delay, and defraud creditors entitles the prevailing party to attorney's fees. *Bartle v. Markson,* 299 F.Supp. 958, 966–67 (N.D.N.Y.1969), *aff'd,* 423 F.2d 637 (2d Cir. 1970). While no similar authority appears in the Bankruptcy Code, the bankruptcy court, as a court of equity, has the reserved power to award attorneys' fees in exceptional situations, as where gross misconduct is involved, as here. *See In re Miller,* 14 B.R. 443 (Bkrtcy.E.D.N.Y.1981); *In re Silverman,* 13 B.R. 270, 24 C.B.C. 471 (Bkrtcy.S.D.N.Y.1981); *see also Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). In the view of this Court, attorneys' fees are necessary in this case both to make the defrauded creditors whole, and to deter conduct of the character present here. Undoing the fraudulent conveyances is not enough.

The creation of a second mortgage has had serious implications for Vaniman, and has substantially diminished the assets available to creditors by the costs to the estate which it has created. Any possibility of rehabilitating Vaniman under Chapter 11 required that it be left in possession of its real estate, which James Martin and Pirrone opposed when they initiated the present proceeding seeking relief from stay so they could enforce the mortgage which this Court has now found was created in

fraud of creditors. It is true that Roslyn Savings Bank, which held a first mortgage on Vaniman's realty, was seeking similar relief, but the fair market value of the Vaniman real estate was so far in excess of Roslyn's claim that the debtor, if it faced Roslyn alone, and if its financial situation had not been so grave, might well have been permitted to stay in possession of its real estate had the outstanding second mortgage not reduced its equity to zero. When Vaniman's Chapter 11 petition was converted to Chapter 7, James Martin and Pirrone continued to press to remove Vaniman's real estate from the bankruptcy court and strenuously opposed its sale, predicating their opposition on the mortgage they had created on September 4, 1979, forcing the trustee into extended litigation to establish his right to do no more than liquidate Vaniman's assets.

This proceeding itself has been time consuming, involving discovery and pretrial conferences, as well as a protracted trial. None of this would have been necessary but for the wrongful creation of a purported security interest in Vaniman's real estate. Simply avoiding the fraudulent conveyances, declaring the mortgage invalid, and requiring James Martin and Pirrone to restore the life insurance policies to Vaniman will not act as a deterrent, since anyone similarly tempted will calculate correctly that they have nothing to lose by similar misconduct if the worst that can happen is that they be required to restore what was improperly taken. Furthermore, the creditors of Vaniman should not be penalized for the wrongdoing of James Martin and Pirrone. Martin and Pirrone, not Vaniman's creditors, should bear the cost of the extensive litigation which they have forced on the trustee in bankruptcy.

Accordingly, an appropriate application should be submitted to this court to determine the amount of attorneys' fees to be awarded.

## IX.

### EQUITABLE SUBORDINATION

In distributing the estate of an insolvent debtor, the bankruptcy court has the power to subordinate the claims of certain creditors on the basis of equitable principles. *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *Sampsell v. Imperial Paper & Color Corp.,* 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293 (1941); *In re Mobile Steel Co.,* 563 F.2d 692 (5th Cir. 1977); 11 U.S.C. § 510(c). The plaintiffs oppose any consideration of this principle as premature in that no claims have as yet been filed by them in this proceeding. They also point out that the doctrine is not relied on in the trustee's counterclaims.

Because of the position taken by the plaintiffs, the Court is abstaining from deciding at this time whether, and to what extent, claims yet to be filed by either James Martin or Pirrone should be subordinated to those of the creditors whom they sought to defraud. Yet, it should be self-evident that the doctrine of collateral estoppel will apply to any proceedings which may raise that issue.

## X.

### JURISDICTION

This Court's delay in deciding this case, due to the unprecedented caseload with which the bankruptcy judges have been struggling, has resulted in this opinion issuing after the Supreme Court's critical decision in *Northern Pipeline Construction Co. v. Marathon Pipeline Co.,* —— U.S. ——, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). However, the Supreme Court has expressly denied a retroactive application of that decision, and has stayed its judgment until October 4, 1982. Moreover, apart from the bribery issue, the other matters decided are within the traditional competence of the bankruptcy court relating, as they do, to issues of preference and fraudulent conveyances. As the majority in *Northern Pipeline* pointed out: "The restructuring of debtor-creditor relations, which is at the core of the Federal bankruptcy power, must be distinguished from the adjudication of state-created private rights * * *." *Id.* at ——, 102 S.Ct. at 2871–72. Five members

of the Supreme Court appear to agree that the bankruptcy court may continue constitutionally to restructure debtor-creditor relations, just as it did prior to 1978. Thus, there is no constitutional impediment to decisions of the issues in this case, even apart from the fact that the Supreme Court has stayed its judgment and is not applying it retroactively. As to the key issue—the validity of the second mortgage held by Martin and Pirrone—the bankruptcy court's possession of the proceeds of the sale of the Vaniman realty gives it clear *in rem* jurisdiction to decide the validity of that lien.

## CONCLUSIONS OF LAW

1. The transfers made, and obligations incurred by Vaniman pursuant to the terms of the Purchase Agreement dated September 4, 1979 (hereinafter "Purchase Agreement"), were made with actual intent to hinder, delay, and defraud existing and future creditors. They constitute fraudulent conveyances under § 548(a) of the Bankruptcy Code, and § 276 of New York's Debtor and Creditor Law. Vaniman's trustee in bankruptcy may avoid such transfers and obligations under § 548(a)(1) of the Bankruptcy Code, and because, on September 4, 1979, there were actual existing creditors of Vaniman who could have avoided them, the trustee may also avoid them by virtue of § 544 of the Bankruptcy Code.

2. Vaniman did not receive from Joseph T. Pirrone and James A. Martin reasonably equivalent value for the transfers made and the obligations incurred pursuant to the terms of the Purchase Agreement. Likewise, Vaniman did not receive fair consideration within the meaning of § 272 of the New York Debtor and Creditor Law. As a result of such transfers and of the obligations which Vaniman incurred pursuant to the Purchase Agreement it (a) became insolvent, (b) was left with an unreasonably small capital for the business in which it was engaged, and (c) intended to incur, and it was believed that it would incur, debts beyond its ability to pay as such debts matured.

3. The transfers made and obligations incurred pursuant to the Purchase Agreement are therefore voidable by the trustee pursuant to § 548(a)(2) of the Bankruptcy Code.

4. The transfers made and obligations incurred pursuant to the Purchase Agreement constitute fraudulent conveyances within the meaning of §§ 273, 274, and 275 of New York's Debtor and Creditor Law. On September 4, 1979, there were actual existing creditors of the debtor who could have avoided such transfers and obligation under §§ 273, 274, and 275 of New York's Debtor and Creditor Law, and, therefore, defendant, as trustee, may avoid such transfers pursuant to § 544 of the Bankruptcy Code.

5. On September 4, 1979, Joseph T. Pirrone and James A. Martin were insiders within the meaning of § 101(25)(B) of the Bankruptcy Code, and had reasonable cause to believe the debtor was insolvent on such date. By virtue of the transfer to them of certain insurance policies, the cash surrender value of other policies, and $33,857 in a second mortgage they received, on account of an antecedent indebtedness, more than they would have received under the provisions of the Bankruptcy Code. Accordingly, these transfers all constitute preferences which Vaniman's bankruptcy trustee may avoid under § 547 of the Bankruptcy Code.

6. The bankruptcy trustee may not recover under § 541(a)(1) of the Bankruptcy Code and New York's Business Corporation Law § 720(b) for the plaintiffs' breach of their fiduciary duty to the debtor corporation by reason of the payments made indirectly to an employee of the Ford Motor Company-Export Division in 1976.

7. The obligations incurred and the transfers and payments made by Vaniman to the plaintiffs pursuant to the Purchase Agreement are all invalid and voided.

8. The lien claimed by Joseph T. Pirrone and James Martin on the proceeds of the sale of Vaniman's real property is of no force and effect and shall be deemed discharged as of record.

9. The trustee is entitled to recover for the benefit of the estate from Joseph T. Pirrone and James A. Martin New York Life Insurance Policy No. 27700543 on the life of Joseph T. Pirrone, and Travellers Life Insurance Policy No. 99045NW202 on the life of James A. Martin, and is entitled to recover from Joseph T. Pirrone the $10,-652.79 cash value of the policies surrendered by the debtor.

10. The trustee is entitled to recover reasonable attorneys' fees from James T. Pirrone and James A. Martin.

Pursuant to Bankruptcy Rule 754(b), the Court is awarding costs to the trustee.

The foregoing constitutes the Court's Findings of Fact and Conclusions of Law.

Submit judgment.